**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| **Triston D. Fowler,** | ) | **Civil Action No.:__________** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **COMPLAINT** |
| | ) | |
| **Navy Federal Credit Union,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | |
| ______________________________ | ) | |

**COMPLAINT**

1. This is an action brought by Plaintiff, Triston D. Fowler, for actual, statutory and punitive damages, attorneys' fees, and costs for Defendant's violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*. (hereinafter "FCRA"). Plaintiff also seeks compensatory and punitive damages for the Defendant's violations of South Carolina common law set forth herein.

2. The FCRA exists to protect consumers' privacy and to impose upon those who trade in consumers' private information strict requirements to ensure that the information they report is as accurate as possible.

3. Before the enactment of the FCRA, inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517 (1969).

4. To accomplish Congress' goals, the FCRA contains a variety of requirements to protect consumers, §§ 1681s-2(b), which is one of the cornerstone provisions of the FCRA.

5. One of the primary purposes of the FCRA is to assure "maximum possible accuracy" of consumer information to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

6. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home*. *We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

## JURISDICTION AND VENUE

7. This Court has Jurisdiction under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681p and 28 U.S.C. §1331 and §1367.

8. Venue is proper in the Charleston Division because the Plaintiff now resides in

Charleston County, and the Defendant transacted business there, as well as throughout the state of South Carolina.

## PARTIES

9. Plaintiff, Triston D. Fowler, is a resident and citizen of the State of South Carolina, Charleston County, and is over the age of twenty-one (21) years. Plaintiff is a consumer as that term is defined by the FCRA, 15 U.S.C. §1681a(c).

10. Defendant Navy Federal Credit Union (hereinafter referred to as "NFCU") whose corporate status is unknown to Plaintiff, may be served with process by way of its President and CEO, Dietrich Kuhlmann at its headquarters located at 820 Follin Lane SE, Vienna, VA 22180-4907. Defendant NFCU was in all respects and at all times relevant herein doing business in the state of South Carolina.

11. NFCU is a furnisher of information to multiple Consumer Reporting Agencies ("CRAs"), including Equifax, Experian, and TransUnion, in that it regularly reports account data on consumer credit cards.

## FACTUAL ALLEGATIONS

12. In September 2024, Plaintiff first became aware that he was the victim of identity theft when Bank of America alerted him that his Social Security number was being used to enroll in a military benefits program.

13. Upon reviewing his credit reports, Plaintiff discovered that someone in Rancho Cucamonga, California, had been using his Social Security number since 2019 to obtain credit and purchase vehicles. Specifically, Plaintiff learned that multiple accounts had been opened with Defendant.

14. Plaintiff never opened an account with Defendant, nor did he ever apply for a loan with Defendant.

15. In September 2024, Plaintiff attempted to file an online dispute with Trans Union but was unable to complete his dispute due to issues with the online dispute filing process. As a result, Plaintiff called Trans Union and specifically disputed eight accounts being reported by Defendant. Specifically, Navy Federal Cr Union, Account No. 430015XXXXX, with a balance of $12,312 and original balance of $14,969; Navy Federal Cr Union, Account No. XXXX, with a balance of $36.00 and a highest balance of $545; Navy Federal CR Union, Account No. 430015XXXXX, with an original balance of $550; Navy Federal CR Union, Account No. 430015XXXXX, with an original balance of $250; Navy Federal CR Union, Account No. 430015XXXXX, with an original balance of $250; Navy Federal CR Union, Account No. 430015XXXXX, with an original balance of $300; Navy Federal CR Union, Account No. 430015XXXXX, with an original balance of $400; and Navy Federal CR Union, Account No. 430015XXXXX, with an original balance of $250, (collectively, hereinafter "Accounts"). Plaintiff also added a security freeze to his Trans Union credit report. Finally, Plaintiff purchased monthly credit monitoring services from Trans Union, for $32.05 per month.

16. On September 17, 2024, Plaintiff obtained a copy of his Experian credit report and also added a credit freeze to his Experian credit report. At that time, Plaintiff's Experian credit score was 687 due to all of the inaccurate Accounts being included on his report.

17. On September 17, 2024, Plaintiff contacted Defendant concerning his identity being stolen and fraudulent NFCU Accounts being opened in his name.

18. On the same day, Defendant emailed Plaintiff an Identity Theft Brochure to complete and return.

19. On September 18, 2024, Plaintiff did an online dispute with Experian of the Accounts. Upon receipt of Plaintiff's dispute, Experian forwarded same to Defendant.

20. On September 18, 2024, Plaintiff also did an online dispute with Equifax wherein he disputed the two open NFCU Accounts as fraudulently opened in his name. Plaintiff also disputed two addresses that did not belong to him, including the Rancho Cucamonga, California, address. Upon receipt of Plaintiff's dispute, Equifax forwarded same to Defendant.

21. On September 19, 2024, Plaintiff filed a police report with the Spartanburg Police Department because he was living in Spartanburg at the time. That same day, Plaintiff also filed an identity theft report with the Federal Trade Commission.

22. On October 9, 2024, Experian provided Plaintiff with its Dispute Results showing that Defendant verified each and every Account as accurate. Accordingly, Experian continued reporting all of the fraudulent Accounts as belonging to Plaintiff on his credit file.

23. On or about October 11, 2024, Equifax provided Plaintiff with its Reinvestigation Results showing that Defendant had again verified each of the fraudulent Accounts as accurate. Accordingly, Equifax continued to report the fraudulent Accounts as belonging to Plaintiff. While the Accounts were not derogatory at this time, they were still negatively impacting Plaintiff's credit score and ability to obtain credit because one of the Accounts (ending 3147) was a new account with a balance of over $12,000.

24. On October 20, 2024, Plaintiff obtained a new copy of his Experian credit report which continued to report eight fraudulent NFCU Accounts as belonging to him.

25. On or about December 21, 2024, Plaintiff made two telephone disputes with Equifax. The first call lasted seven minutes. The second call lasted nine minutes. During each of these calls, Plaintiff explained to Equifax that someone in California had been using his Social Security number and obtaining credit in his name. Plaintiff disputed the NFCU Accounts and the address linked to those Accounts as not his as fraudulent.

26. Following receipt of Plaintiff's disputes, Equifax forwarded notice of those disputes to Defendant.

27. On January 15, 2025, Plaintiff filed a second police report and FTC Report.

28. That same day, Plaintiff disputed two of the Accounts as not his and as fraudulent with Experian. Upon receipt of Plaintiff's dispute, Experian forwarded same to Defendant.

29. On January 23, 2025, Plaintiff contacted the Naval Criminal Investigative Service (NCIS) to report that an active-duty service member was using his SSN.

30. On that same day, Plaintiff submitted his identity theft claim to Defendant electronically. Upon receipt, Defendant emailed Plaintiff that they had received his fraud claim that an unauthorized Navy Federal membership account had been opened in his name, that an investigation had been launched, and that they would be in touch with him soon.

31. On February 5, 2025, Experian forwarded Plaintiff its Dispute Results which showed that the disputed, fraudulent Accounts remained.

32. On or about February 7, 2025, Defendant began reporting one of the Accounts as over the credit limit on Plaintiff's credit files.

33. On February 9, 2025, Plaintiff called Defendant three separate times to dispute the Accounts and the Navy Federal membership. One of the calls lasted 30 minutes and Plaintiff was repeatedly assured by Defendant they would get the matter corrected. Yet, Defendant actually did nothing to correct the issue.

34. On that same day, Defendant emailed Plaintiff stating they had closed his identity theft claim. In that same email Defendant thanked Plaintiff for being a Navy Federal member.

35. On February 9, 2025, Plaintiff called Experian and again informed them he was the victim of identity theft and that the Accounts were fraudulent. Thereafter, Experian forwarded notice of Plaintiff's disputes to Defendant.

36. On February 12, 2025, Plaintiff filed an online dispute with Equifax again disputing two open, fraudulent Accounts appearing on his credit report. Upon receipt of Plaintiff's dispute, Equifax forwarded same to Defendant.

37. On February 12, 2025, Plaintiff called Experian again to dispute the inaccurate information appearing on his Experian credit report. Plaintiff spent 57 minutes on the phone with Experian trying to get his credit report corrected and the inaccurate Accounts removed.

38. On February 17, 2025, at 8:31 a.m., Plaintiff called Defendant regarding the fraudulent Accounts opened in his name that did not belong to him and that were continuing to be reported on his credit reports.

39. On February 17, 2025, at 10:16 a.m., at the instruction of Defendant, Plaintiff emailed Defendant stating that he had never opened an Account with Defendant and that

his identity was used to open a credit card, auto loan, and personal loans without his knowledge. Plaintiff also informed Defendant that he had never opened an account with them and that Defendant was reporting Accounts on his credit reports. With his email, Plaintiff attached a completed Identity Theft Packet and a Social Security Administration Report of Confidential Social Security Benefit Information.

40. On February 19, 2025, Plaintiff called Defendant to confirm Defendant didn't need any other information to investigate Plaintiff's dispute.

41. On February 25, 2025, Plaintiff again called Experian to dispute the fraudulent information appearing on his Experian credit report.

42. On February 28, 2025, Plaintiff obtained a new copy of his Experian credit report which continued to include two fraudulent addresses that did not belong to Plaintiff. Additionally, Plaintiff's credit report continued to include the fraudulent Accounts which were reporting as belonging to Plaintiff. Upon receipt of Plaintiff's disputes, Experian forwarded same to Defendant.

43. On March 24, 2025, Plaintiff called Defendant twice to follow up on his fraud claim but each time he had to leave a message.

44. On March 27, 2025, Plaintiff obtained a new copy of his Experian credit report to see if any changes had been made. Unfortunately, all of the Accounts continued to be reported as belonging to Plaintiff.

45. On March 31, 2025, Defendant emailed Plaintiff that they had received his fraud claim regarding an unauthorized Navy Federal membership account being opened in his name. Defendant stated that an investigation had been launched and they would be in touch

soon to let Plaintiff know what actions were being taken. Defendant also acknowledged that incidents like this can be very stressful and disruptive.

46. One minute later, Defendant emailed Plaintiff stating they had honored his identity theft claim and closed all Navy Federal Accounts included in his claim.

47. From April 2025 through May 2025, Plaintiff monitored his credit reports waiting for Defendant to delete the Accounts.

48. On May 26, 2025, Plaintiff obtained a new copy of his Experian credit report and discovered that, contrary to Defendant's email stating it had closed all of the Accounts in Plaintiff's name as fraudulent, Defendant was continuing to report all eight Accounts as belonging to him.

49. On June 30, 2025, Plaintiff obtained a copy of his Experian credit report which showed that, despite receipt of numerous identity theft claims, multiple telephone calls, and disputes through the credit reporting agencies, Defendant was continuing to report the Accounts as belonging to Plaintiff.

50. On September 10, 2025, at 12:51 p.m., Plaintiff called Defendant to again dispute the fraudulent Accounts.

51. On that same day, at 1:29 p.m., Defendant called Plaintiff back and again assured him that it would correct the problem.

52. On September 23, 2025, at 12:19 p.m., Plaintiff called Defendant and spent 41 minutes on the phone again explaining that he was the victim of identity theft and requesting that Defendant remove the Accounts from Plaintiff's name and social security number.

53. Immediately following Plaintiff's call to Defendant, Defendant emailed Plaintiff confirming receipt of his fraud claim that an unauthorized Navy Federal membership account had been opened in his name. Defendant also informed him that an investigation had been launched and that Defendant would be in contact with Plaintiff soon.

54. On or about September 26, 2025, Plaintiff called Equifax to dispute the fraudulent Accounts appearing on his credit report. Thereafter, Equifax forwarded notice of Plaintiff's disputes to Defendant.

55. On October 23, 2025, Defendant reported one of the Accounts as being over the credit limit and 30 days past due to Trans Union. As a result, Plaintiff's Trans Union credit score immediately dropped.

56. On October 23, 2025, as soon as Plaintiff was alerted by Trans Union that Defendant had reported the Account as a derogatory account on his credit report, Plaintiff called Defendant. Plaintiff's call with Defendant lasted 47 minutes.

57. On October 24, 2025, Defendant reported one of the Accounts as being over the credit limit and past due to Experian. As a result, on October 27, 2025, Plaintiff's Experian credit score dropped by 97 points to 599.

58. On October 27, 2025, Defendant emailed Plaintiff an update on his identity theft claim stating they had honored his claim and closed all Navy Federal Accounts in his name.

59. On November 20, 2025, Plaintiff called Defendant to confirm that his name and social security number had been removed from all of the Accounts and Defendant so confirmed. During this call, Defendant informed Plaintiff that it could take several months for his credit reports to be updated.

60. From November 20, 2025, through January 2026, Plaintiff continued monitoring his credit reports waiting for Defendant to delete the Accounts as promised.

61. On January 6, 2026, Plaintiff again contacted Defendant regarding the Accounts. During this call, Defendant informed Plaintiff he had no active accounts with them.

62. On January 23, 2026, Plaintiff received an alert that his Trans Union credit score had dropped.

63. That same day, Plaintiff again contacted Defendant concerning the fraudulent Accounts which were being reported as belonging to him on his credit reports. During this call Defendant told Plaintiff that he did not have an "active" account with them. Yet, despite confirming that Plaintiff had no Account with Defendant, Defendant was continuing to report the Accounts to the credit reporting agencies.

64. On February 12, 2026, Plaintiff called Experian to dispute the two Accounts which were being reporting as open on his credit report, as well as other information. Upon receipt of Plaintiff's dispute, Experian forwarded same to Defendant.

65. In February 2026, Plaintiff viewed a current copy of his Equifax credit report which continued to include all of the Accounts.

66. On or about February 12, 2026, Plaintiff filed an online with dispute with Equifax again disputing the Accounts as fraudulent. Upon receipt of Plaintiff's dispute, Equifax forwarded same to Defendant.

67. On or about February 12, 2026, Plaintiff also filed an online dispute with Trans Union disputing the Accounts, and other information, as fraudulent. With his dispute, Plaintiff provided Trans Union with a copy of his police report, FTC Identity Theft

Affidavit, driver's license, and Social Security card. Upon receipt of Plaintiff's dispute, Trans Union forwarded same to Defendant.

68. On or about February 15, 2026, Trans Union sent Plaintiff a letter informing Plaintiff that it denied his request to block the two fraudulent Accounts.

69. On February 20, 2026, Experian forwarded Plaintiff dispute results wherein Experian informed Plaintiff that the two disputed Accounts were still under investigation and the investigation should be completed by March 12, 2026. Defendant also provided an updated copy of Plaintiff's Experian credit report which showed that the two disputed, fraudulent Accounts were still reporting as belonging to Plaintiff.

70. On February 28, 2026, Plaintiff filed a new online dispute with Trans Union. Upon receipt of Plaintiff's dispute, Trans Union forwarded same to Defendant.

71. On or about March 3, 2026, Plaintiff accessed the Equifax portal and learned that Defendant had mailed two February 2026 reinvestigation results to the fraudulent address in Rancho, Cucamonga, California used by the individual illegally using Plaintiff's social security number. These reinvestigation results showed that the two open, fraudulent Accounts had been verified by Defendant as accurate and updated. Accordingly, the fraudulent Accounts continued to be reported on Plaintiff's Equifax credit report. Additionally, Account ending 3344 was now reporting as a derogatory Account as it was 30 days past due.

72. On or about March 4, 2026, Plaintiff filed an online dispute with Trans Union, again disputing the fraudulent Accounts and other inaccurate information appearing on his Trans Union credit report. Upon receipt of Plaintiff's dispute, Trans Union forwarded a copy of

same to Defendant.

73. On that same day, Plaintiff received an email from Trans Union stating its investigation was complete. Upon review of Trans Union's dispute results, Plaintiff discovered that Defendant had again verified the reporting of one of the Accounts as accurate. Accordingly, that Account remained on Plaintiff's credit report. A second Account was finally deleted.

74. On March 10, 2026, Experian sent Plaintiff its dispute results which indicated that Defendant had verified one of the Accounts as accurate. Accordingly, the derogatory, fraudulent Account remained on Plaintiff's Experian credit report.

75. On March 13, 2026, Plaintiff again contacted Defendant concerning the fraudulent Accounts continuing to report on his credit reports as belonging to him. While Defendant confirmed they had no active membership account in Plaintiff's name, Defendant continued to report the Accounts as belonging to Plaintiff.

76. Immediately following that telephone call, Defendant emailed Plaintiff confirming that they had received his fraud claim that an unauthorized Navy Federal membership account had been opened in his name and that an investigation had been launched. In this email, Defendant also acknowledged that this type of incident can be very stressful and disruptive.

77. In March 2026, Plaintiff accepted a new job in Charleston, South Carolina and needed to relocate to Charleston as soon as possible.

78. Accordingly, although the fraudulent Accounts continued to be reported on Plaintiff's credit reports, on or about March 20, 2026, Plaintiff had no choice but to begin

applying for a mortgage as he needed to purchase a new home.

79. Plaintiff applied for a mortgage through Rev Federal Credit Union who obtained copies of Plaintiff's credit reports through several sources. At the time Rev FCU obtained Plaintiff's credit reports, the Account ending 3344 was reporting as a derogatory account and negatively impacting Plaintiff's credit score and credit standing.

80. On or about March 26, 2026, Plaintiff obtained a copy of his Trans Union credit report which confirmed Defendant was continuing to report the fraudulent Accounts as belonging to Plaintiff. Plaintiff immediately disputed the Accounts with Trans Union. Upon receipt of Plaintiff's dispute, Trans Union forwarded a copy of same to Defendant.

81. On or about March 26, 2206, Plaintiff also filed a fourth online dispute with Equifax wherein he again disputed the fraudulent Accounts. Upon receipt of Plaintiff's dispute, Equifax forwarded a copy of same to Defendant.

82. On March 26, 2026, Defendant emailed Plaintiff stating that they had honored his identity theft claim and that all Navy Federal Accounts included in his claim had been closed.

83. On or about April 15, 2026, Equifax sent Plaintiff its Reinvestigation Results wherein Equifax informed Plaintiff one of the fraudulent Accounts had been deleted from his Equifax credit file and the second fraudulent Account had been "verified" by Defendant, but Equifax also deleted that Account from Plaintiff's credit file.

84. On or about April 17, 2026, Plaintiff received an email from Trans Union stating their investigation was complete and the dispute results were ready for Plaintiff's review.

85. On April 17, 2026, Plaintiff also received an email from Rev FCU regarding the

derogatory Account appearing on his credit report and requesting additional documents to support his claim that the Account was fraudulent and did not belong to him. In this email, Plaintiff was informed that the underwriter would need to conduct a further review of Plaintiff's application and that it would case a delay in Plaintiff's closing.

86. On June 11, 2026, Plaintiff sent a dispute letter to Experian wherein he specifically informed Experian that another individual by the name of Triston D. Fowler had been wrongfully using Plaintiff's social security number since 2019. Plaintiff informed Experian that he did not live at the military address on his credit report and that he had never been in the military. Accordingly, Plaintiff requested that address be deleted. Plaintiff also disputed all eight Accounts as not his. Plaintiff specifically informed Experian that he had never borrowed money from Defendant and that the Accounts were not his accounts. With his dispute letter, Plaintiff included a copy of his police report, FTC Affidavit, and a letter from Social Security confirming that it had mistakenly given Plaintiff's social security number to a third party. Experian received Plaintiff's dispute letter on June 15, 2026, and thereafter forwarded same to Defendant.

87. On June 11, 2026, Plaintiff sent a dispute letter to Trans Union wherein he specifically informed Trans Union that another individual by the name of Triston D. Fowler had been wrongfully using Plaintiff's social security number since 2019. Plaintiff informed Trans Union that he did not live at the military address on his credit report and that he had never been in the military. Accordingly, Plaintiff requested the incorrect military address be deleted from his credit report. Plaintiff also disputed any addresses in California appearing on his credit report because he had never lived in California. Next, Plaintiff

disputed all of the Accounts as "not his." Plaintiff specifically informed Trans Union that he had never borrowed money from Defendant and that the Accounts were not his accounts. With his dispute letter, Plaintiff included a copy of his police report, FTC Affidavit, and a letter from Social Security confirming that it had mistakenly given Plaintiff's social security number to a third party. Trans Union received Plaintiff's dispute letter on June 16, 2026, and thereafter forwarded same to Defendant.

88. In June 2026, Plaintiff viewed a copy of his current Equifax credit report and discovered that the two Accounts Equifax had previously stated were deleted, were in fact not deleted. Accordingly, on June 11, 2026, Plaintiff mailed a dispute letter to Equifax via certified mail. In his letter, Plaintiff specifically informed Equifax that another individual by the name of Triston D. Fowler had been wrongfully using Plaintiff's Social Security number since 2019. Plaintiff informed Equifax that he did not live at the military address in Rancho Cucamonga, California, listed on his credit report and that he had never been in the military. Plaintiff requested the address be completely deleted from his credit report. Plaintiff also disputed all of the Accounts. Plaintiff specifically informed Equifax that he had never borrowed money from Defendant and that the Accounts were not his accounts. With his dispute letter, Plaintiff included a copy of his driver's license, police report, FTC Affidavit, and a letter from Social Security confirming that it had mistakenly given Plaintiff's Social Security number to a third party. Equifax received Plaintiff's written dispute and supporting documents on June 13, 2026, and thereafter forwarded same to Defendant.

89. On June 19, 2026, Trans Union forwarded Plaintiff the results of its alleged

investigation into Plaintiff's disputes, wherein Trans Union informed Plaintiff that three inquiries were deleted from his credit report. While the investigation results did not provide any information regarding the disputed Accounts, an enclosed updated credit report showed that the disputed Accounts had finally been removed from his Trans Union credit file.

90. On June 23, 2026, Plaintiff filed another online dispute of the fraudulent Accounts with Equifax. Upon receipt of Plaintiff's dispute, Equifax forwarded same to Defendant.

91. On or about June 24, 2026, Experian forwarded Plaintiff two separate dispute results wherein Experian informed Plaintiff that all of the Defendant's inquiries had been deleted from his credit report. Upon review of his credit report attached to the first dispute results, Plaintiff discovered that all of the disputed Accounts had finally been removed from his Experian credit file.

92. On or about June 24, 2026, Equifax sent Plaintiff Reinvestigation Results wherein Equifax informed Plaintiff that the disputed Accounts were "not currently reporting on [his] Equifax credit report."

93. Defendant repeatedly failed to make a reasonable investigation into Plaintiff's disputes.

94. As a result of Defendant's failure to reasonably investigate Plaintiff's disputes, Plaintiff's mortgage and the subsequent closing on Plaintiff's new home was delayed approximately one month, Plaintiff incurred additional out of pocket costs, Plaintiff was forced to expend additional time working to be approved for the mortgage, and Plaintiff was charged a higher interest rate for the mortgage.

95. From at least September 17, 2024, through the present, Defendant has intentionally and willfully reported false, libelous, inaccurate, and defamatory information regarding the Plaintiff to the national credit reporting agencies, numerous third parties, and the public at large. During the past two years while Defendant was reporting the fraudulent Accounts as belonging to Plaintiff, said information was provided to and/or viewed by Rev Federal Credit Union via Xactus Rev Federal Credit Union, FD/Rocket Mortgage, Equifax Mortgage Services, NFM Lending via CICNFM Lending, South Carolina Federal via Equifax Mortgage Service, Liberty Mutual, Progressive Insurance, Avant LLC, Capital One, Capital One Auto, Union Credit Inc., and Homesite Group.

96. Defendant's knowing and repeated violations of the FCRA warrants an award of punitive damages. *See, e.g., Younger v. Experian Info. Sols. Inc.,* Case No. 2:15-cv-0952-SGC, at *30 (N.D. Ala. Mar. 21, 2019) (awarding punitive damages for repeated, willful violations of the FCRA).

**COUNT ONE**
**(Fair Credit Reporting Act)**

97. The Plaintiff adopts the averments and allegations of paragraphs 12 through 96 hereinbefore as if fully set forth herein.

98. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct an investigation after receiving notice that Plaintiff disputed the Account information said Defendant had provided to a consumer reporting agency.

99. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agency pursuant to §1681i.

100. Defendant negligently violated 15 U.S.C. §1681s-2(b) by failing to conduct an investigation as to the accuracy of the information reported by the Defendant to the consumer reporting agencies.

101. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to the consumer reporting agencies.

102. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the Accounts the subject of this action was inaccurate, incomplete, false, and misleading.

103. The law in this District, the Fourth Circuit, and even nationally has long ago been articulated to require a detailed and searching investigation by a furnisher when it receives a consumer's FCRA dispute through a consumer reporting agency.

104. Defendant completely failed and/or refused to conduct a detailed and searching inquiry as required by the FCRA. Instead, Defendant simply verified the Accounts each and every time it received an ACDV regarding Plaintiff's dispute of the Accounts as fraudulent, even after Defendant received numerous direct disputes, Plaintiff's police report, and Plaintiff's Identity theft packet.

105. As a result of Defendant's violations set forth above, the Plaintiff suffered, continues to suffer, and will suffer future damages, including, but not limited to, damage to Plaintiff's credit score and credit reputation, a delay in being approved for a mortgage and closing on his home which cost Plaintiff additional out of pocket expenses due to the delay and a higher interest rate, family discord, worry, inability to focus, loss of sleep, time

spent repeatedly reaching out to Defendant to dispute the inaccurate Accounts Defendant continued to report to the credit reporting agencies, invasion of privacy, headaches, irritability, loss of enjoyment of life, physical pain and sickness, frustration, embarrassment and mental anguish. Additionally, the damage caused to Plaintiff's credit score and credit reputation by Defendant's ongoing reporting of the Accounts as belonging to Plaintiff precluded Plaintiff from seeking further credit opportunities and also caused him to not receive promotional offers of credit. Plaintiff is entitled to actual damages in an amount to be determined by the jury.

106. In addition, Plaintiff has incurred litigation costs and attorneys' fees which, but for the acts and omissions of Defendant alleged herein, would not have been necessary.

107. Plaintiff is entitled to his attorneys' fees, pursuant to 15 U.S.C. §1681o(a)(2).

**<u>COUNT TWO</u>**
**(Fair Credit Reporting Act)**

108. The Plaintiff adopts the averments and allegations of paragraphs 12 through 107 hereinbefore as if fully set forth herein.

109. Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct an investigation after receiving notice that the Plaintiff disputed the Account information Defendant had provided to a consumer reporting agency.

110. Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agency pursuant to §1681i.

111. Defendant willfully violated 15 U.S.C. §1681s-2(b) by failing to conduct an investigation as to the accuracy of the information reported by Defendant to a consumer

reporting agency.

112. Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to the consumer reporting agency.

113. Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the Accounts the subject of this action was inaccurate, incomplete, false, and misleading.

114. The law in this District, the Fourth Circuit, and even nationally has long ago been articulated to require a detailed and searching investigation by a furnisher when it receives a consumer's FCRA dispute through a consumer reporting agency.

115. Defendant willfully and intentionally failed and/or refused to conduct a detailed and searching inquiry as required by the FCRA. Instead, Defendant simply verified the Accounts each and every time it received an ACDV regarding Plaintiff's dispute of the Accounts as fraudulent, even after Defendant received numerous direct disputes from the Plaintiff, Plaintiff's police report, and Plaintiff's identity theft packet.

116. As a result of Defendant's willful violations set forth above, the Plaintiff suffered, continues to suffer, and will suffer future damages, including, but not limited to, damage to Plaintiff's credit score and credit reputation, a delay in being approved for a mortgage and closing on his home which cost Plaintiff additional out of pocket expenses due to the delay and a higher interest rate, family discord, worry, inability to focus, loss of sleep, time spent repeatedly reaching out to Defendant to dispute the inaccurate Accounts Defendant continued to report to the credit reporting agencies, invasion of privacy, headaches,

irritability, loss of enjoyment of life, physical pain and sickness, frustration, embarrassment and mental anguish. Additionally, the damage caused to Plaintiff's credit score and credit reputation by Defendant's ongoing reporting of the Accounts as belonging to Plaintiff precluded Plaintiff from seeking further credit opportunities and also caused him to not receive promotional offers of credit. Plaintiff is entitled to actual damages in an amount to be determined by the jury.

117. Due to Defendant's willful violations of the FCRA, Plaintiff is entitled to punitive damages in an amount to be determined by the jury.

118. In addition, Plaintiff has incurred litigation costs and attorney's fees which, but for the acts and omissions of Defendant alleged herein, would not have been necessary.

119. Plaintiff is entitled to his attorneys' fees, pursuant to 15 U.S.C. §1681n(a)(3).

**COUNT THREE**
**(Defamation, Libel, and Slander)**

120. The Plaintiff adopts the averments and allegations of paragraphs 12 through 119 hereinbefore as if fully set forth herein.

121. Defendant willfully, wantonly, recklessly and/or maliciously published and communicated false and defamatory statements regarding Plaintiff to third parties and the public at large. Said statements harmed Plaintiff's reputation and caused Plaintiff physical sickness, mental anguish, and emotional distress.

122. Said communications were false in that Plaintiff was not indebted to Defendant. Plaintiff did not owe any balance on the Accounts the subject of this action as said Accounts were clearly fraudulent.

123. Said false and defamatory statements harmed the reputation of Plaintiff and/or deterred third persons from associating with Plaintiff. Specifically, Defendant reported the Accounts to the national credit reporting agencies as belonging to Plaintiff so the Accounts would appear on Plaintiff's credit reports. Plaintiff's credit reports were viewed by numerous third parties as set out above and, as a result, Plaintiff suffered damages.

124. Defendant communicated to third parties and the public at large false information concerning Plaintiff, disseminating and imputing false and misleading credit worthiness information concerning Plaintiff, including but not limited to reporting that Plaintiff owed the Accounts the subject of this action.

125. At the time said communications were made, Defendant knew or should have known the falsity of the communications or recklessly disregarded the potential inaccuracy of the information, yet knowingly, willfully, and maliciously communicated the falsity.

126. As a result of Defendant's intentional communications to third parties of the false information, Plaintiff was caused to suffer injury to his reputation in the eyes of his community and the public at large, and was forced to endure credit reporting of the Accounts in spite of the fact that Plaintiff did not owe the Accounts as they were fraudulently opened in his name without his knowledge or permission.

127. As a proximate consequence of said defamation, libel and slander, Plaintiff was caused to have negative credit reports, to be held up to public ridicule or shame, and made to suffer humiliation, anxiety, stress, family discord, headaches, loss of sleep, anger, worry, physical sickness, loss of enjoyment of life, and mental anguish. Plaintiff also suffered a delay in being approved for a mortgage and closing on his home which cost Plaintiff

additional out of pocket expenses due to the delay and a higher interest rate. Plaintiff has also spent a tremendous amount of time repeatedly reaching out to Defendant to dispute the inaccurate Accounts, make disputes to the credit reporting agencies, and monitor his credit. Plaintiff is entitled to and seeks compensatory and punitive damages in an amount to be determined by the jury.

**COUNT FOUR**
**(Negligent Training and Supervision)**

128. The Plaintiff adopts the averments and allegations of paragraphs 12 through 127 hereinbefore as if fully set forth herein.

129. Defendant knew or should have known of the conduct set forth herein which was directed at and visited upon Plaintiff.

130. Defendant knew or should have known that said conduct was improper and in violation of the Fair Credit Reporting Act and the laws of the State of South Carolina.

131. Defendant negligently failed to train and supervise its agents and employees in order to prevent said improper and unconscionable conduct.

132. Defendant negligently failed to train and supervise its agents and employees on the Fair Credit Reporting Act and South Carolina common law.

133. As a result of Defendant's negligence, Plaintiff was caused to have negative credit reports, to be held up to public ridicule or shame, and made to suffer humiliation, anxiety, stress, family discord, headaches, loss of sleep, anger, worry, physical sickness, loss of enjoyment of life, and mental anguish. Plaintiff also suffered a delay in being approved for a mortgage and closing on his home which cost Plaintiff additional out of pocket

expenses due to the delay and a higher interest rate. Plaintiff has also spent a tremendous amount of time repeatedly reaching out to Defendant to dispute the inaccurate Accounts, make disputes to the credit reporting agencies, and monitor his credit. Plaintiff is entitled to and seeks compensatory damages in an amount to be determined by the jury.

**COUNT FIVE**
**(Reckless and Wanton Training and Supervision)**

134. The Plaintiff adopts the averments and allegations of paragraphs 12 through 133 hereinbefore as if fully set forth herein.

135. Defendant knew or should have known of the conduct set forth herein which was directed at and visited upon Plaintiff.

136. Defendant knew or should have known that said conduct was improper and in violation of the Fair Credit Reporting Act and the laws of the State of South Carolina.

137. Defendant recklessly and wantonly failed to train and supervise its agents and employees in order to prevent said improper and unconscionable conduct.

138. Defendant recklessly and wantonly failed to train and supervise its agents and employees on the Fair Credit Reporting Act and South Carolina common law.

139. As a results of Defendant’s reckless and wanton conduct, Plaintiff was caused to have negative credit reports, to be held up to public ridicule or shame, and made to suffer humiliation, anxiety, stress, family discord, headaches, loss of sleep, anger, worry, physical sickness, loss of enjoyment of life, and mental anguish. Plaintiff also suffered a delay in being approved for a mortgage and closing on his home which cost Plaintiff additional out of pocket expenses due to the delay and a higher interest rate. Plaintiff has also spent a

tremendous amount of time repeatedly reaching out to Defendant to dispute the inaccurate Accounts, make disputes to the credit reporting agencies, and monitor his credit. Plaintiff is entitled to and seeks compensatory and punitive damages in an amount to be determined by the jury.

## AMOUNT OF DAMAGES DEMANDED

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands a judgment against Defendant for the following:

A. Actual and/or statutory damages from Defendant pursuant to 15 U.S.C. §1681n(a)(1)(A) and/or 15 U.S.C. §1681o(a)(1).

B. Punitive damages from Defendant pursuant to 15 U.S.C. §1681n(a)(2);

C. Costs and reasonable attorney's fees from Defendant pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2);

D. For compensatory and punitive damages in an amount to be determined by a struck jury for Defendant's Defamation, Libel and Slander of Plaintiff, Negligent Training and Supervision, and Reckless and Wanton Training and Supervision;

E. For this matter to be heard by a jury; and

F. For such other and further relief as this Court deems necessary and proper.

/s/ *Penny Hays Cauley*
Penny Hays Cauley, Fed. ID No. 10323
**HAYS CAULEY, P.C.**
1303 West Evans Street
Florence, SC 29501
(843) 665-1717
phc917@hayscauley.com
*Attorney for Plaintiff*

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS**

*/s/ Penny Hays Cauley*
Of Counsel

**DEFENDANT TO BE SERVED BY PROCESS SERVER AT:**
Navy Federal Credit Union
c/o Dietrich Kuhlmann, President and CEO
820 Follin Lane SE
Vienna, Virginia 22180-4907